IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA

    VS.                                                                              Criminal Case No. 22-00038-JB

WILMER OROBIO PAYAN
_____/

## WILMER O. PAYAN' SENTENCING MEMORANDUM

    Wilmer Orobio Payan. was born on May 14, 1970, in a coastal village on the Pacific Ocean named Trejo in Mosquera Nariño, Colombia.[1] He is the third child of eight children. His mother's name is Flora Payan Montaño and his dad Juvencio Orobio Cisneros. Mr. Payan has been in a common law relationship for 24 years with Luz Yeni Angulo Mondragón. The couple have three children Jederson W. Orobio Angulo, (20) Ashley Naomi Orobio, (17) and Luz Iris Dajan Orobio. Ms. Angulo also has an older son. Pictured in the first photo below with his two kids.

  

Family photos of Mr. Payan's family and Payan with one of his daughters at a graduation.

---

[1] Exhibit 1 Payan's "Cedula" or personal identification card confirms his date and place of birth. Also included is his driver's license, and a fishing license. These are documents seized by the USCG. (Submitted under seal.)

Payan's father worked as a fisherman by trade. He proudly relates that he joined his father and worked with him from the age of seven. While he attended school from Monday to Friday, on Saturdays and Sundays he helped his father fishing. To this day, he treasures that time spent with his father at sea. When he was seventeen years old, on a Thursday in September 1987, his father went fishing as he usually did. He was killed by unknown persons who stole his boat engine. Payan says, "I couldn't study anymore because it was then my turn to step up, to work, to help support my little siblings, and my mother." Five years after his father death, Payan moved to Buenaventura, Colombia and fished there to continue supporting his mother and brothers.

In the year 2000, Mr. Payan and his partner in life, Flora Payan, brought his two youngest sisters to Buenaventura so they could complete their studies. In 2007, they were displaced by paramilitaries in the neighborhood where they lived. He was forced to pay them a portion of his earnings as a fisherman. They moved hoping to avoid the conflict. Sometime thereafter, he was employed as a deckhand on a coastal trader.[2] He worked as a mariner on the coastal trader until the COVID pandemic caused businesses to slow down while others shut down. He was laid off as the company ceased to operate the vessel on which Payan worked.

The layoff ushered in one of the most difficult periods in Payan's life. For the first time, he could not find steady employment for several years. "Life was hard." He remarked and then added, "It is difficult to see your children go hungry." His son had to leave the University because he didn't have the means to pay his monthly allowance.

His partner, Luz Yeni Angulo Mondragón, reports he took on odd jobs including loading lumber. She worked for a time as a helper in store. Adding to their difficulties, his partner Ms. Angulo Mondragon says she cannot work due illness and persistent weakness. She has been diagnosed with arterial hypertension, diabetes type one and problems with her kidneys. Paying for

---

[2] Exhibit 2 Payan's Coastal Mariner License. (Submitted under seal.)

doctor visits and medicine was always a struggle. Payan was at this low point when approached with what seemed like a lifesaver. It seemed like he had no other choice.

> I regret what I did. And so, I ask for forgiveness to the court and to God. I left my children helpless. All my life I have worked to get ahead for my family. I consider myself a good person. In Colombia when you are over 50, they it's difficult to find work. I am very sorry for what I did, and I apologize because leaving my family, is the worst thing I have ever done.

Mr. Payan had no funds to contribute to the charged offense. Upon information and belief, neither could any member of the crew. Without the owners, the unidentified co-conspirators, the planners who purchased the vessel, the engines, the fuel, the cell phones, the GPS and the contraband, the charged offense was not possible. Their role and contribution to this offense is discernible, self-evident. Mr. Wilmer O. Payan's role in this offense, was limited to transporting the drugs from one location to another. It is undisputed from the government's evidence that Payan's and the crew were couriers. He was to receive a fixed sum for his role, and he had no proprietary interest in the contraband. Compared to the roles of those higher in the charged conspiracy, who invested more and stood more to gain Payan's was less culpable. We respectfully request that the Court take these factors into consideration for a downward variance.

The drug quantity in this case is approximately 1, 315 kilograms of cocaine, which generates the highest possible base offense level of 38. Any amount at or above 450 kg of cocaine would result in this offense level. As the Court is aware, higher drug quantities were a proxy for culpability, with higher quantities of drugs viewed as indicative of greater responsibility in the drug organization. The 1986 Anti-Drug Abuse Act used the weight of the drugs involved in the offense as the sole proxy to identify major and serious dealers. *Kimbrough v. United States*, 128 S.Ct. 558, 567 (2007). The guideline ranges for drug trafficking are driven by the quantity of drugs and keyed to statutory minimum sentences based on weight. *Gall v. United States*, 128 S.Ct. 586, 594 and n. 2 (2007); *Neal v.*

*United States*, 516 U.S. 284, 291-92 (1996). In *Hayes v. United States*, 948 F.Supp.2d 1009 (N.D. Iowa 2013) (pp.5-21), Judge Mark Bennett noted that the U.S. Sentencing Commission organized offenders on a continuum of decreasing culpability from high-level supplier; organizer/leader; grower/manufacturer; wholesaler; manager/supervisor; street-level dealer; broker/steerer; down to a courier and mule at the lowest level of culpability. The base offense level of 38 for the instant offense mergers these mitigating distinctions and treats Mr. Wilmer O. Payan, a courier, the same as the owners planners and managers of the venture.

MDLEA cases are the only category of cases in which the Government is granted the discretion to select the jurisdiction and venue anywhere in the United States. [3] Since they are free to forum shop anywhere in the country, fairness and due process concerns require that exercising that discretion does not result in unwarranted sentencing disparities. Defense counsel reviewed similar recent cases in this District and in the Southern District of Florida in which the courts granted downward variances to defendants whose cases and circumstances were similar to Wilmer O. Payan's case, among them:

> 19-CR-20153-RKA – On August 23, 2019, Defendant Jose Vicente Saltizabal Madrid was sentenced to 96 months as captain of a semi-submersible vessel carrying 2,742 kilograms of cocaine.
>
> 19-CR-20715-KMW – On June 30, 2020, Defendant William Obando Barrantes was sentenced to 63 months as the captain on a boat with 50 kilograms of cocaine and 1,600 pounds of marijuana, the other two crewmembers received 51 and 48 months respectively.

---

[3] See Section 70504, captioned "Jurisdiction and venue," added to the MDLEA in 1996, provides:

"(a) Jurisdiction. —Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge.

(b)Venue. — A person violating section 70503 or **70508** —
    (1) shall be tried in the district in which such offense was committed; or
    (2) if the offense was begun or committed upon the high seas, or elsewhere outside the jurisdiction of any particular State or district, may be tried in any district.

19-CR-20490-FAM – On November 26, 2019, Defendant Bryan Argentis Franco Reyes was sentenced to 108 months for a case involving 4,359 kilograms – captain not identified

19-20845-RAR – On June 23, 2020, Defendant Jaime Escobar Meza was sentenced to 108 months as a captain of a boat with 1,420 kilograms (the other two crew members also received 108 months).

20-CR-20167-KMW – On November 23, 2020, Defendant Julio Sandi Alvarez sentenced to 70 months as the captain of a boat with 297 kilograms of cocaine and 850 pounds of marijuana, the other crew member received a sentence of 63 months.[4]

In a companion case, Osiber Vente Orobio's, defense counsel submitted the following chart which we include here in support of Payan's request for a downward variance.

MDLEA CASES

1:22-cr-00038-JB
No connection to US
1315 Kilos coke
35 (38-3)/I 168-210

| | | |
|---|---|---|
| Jaminson Valencia Moreno | (Tim Fleming) | 135 MONTHS |
| Osiber Vente Orobio | (Domingo Soto) | 135 MONTHS |
| Wilmer Orobio Payan | (Carlos Williams) | PENDING |

270 mos. x $40,000 = $900,000/yr
(Cost of incarceration in current dollars)

1:22-cr-00007-TFM
No connection to US
4951 Kilos coke
35 (38-3)/I 168-210

| | | |
|---|---|---|
| Alonzo Escobar-Valenzuela | (William Bradford) | 210 months |
| Nestor Javier Salazar-Montano | (Peter Madden) | 168 months |
| Henry Hernandez-Garcia | (Paul Brown) | 168 months |

546 mos. x $40,000/yr = $1,820,000

---

[4] The judgments proffer in these cases are attached collectively as Exhibit 3.

1:22-cr-00096-KD
No connection to US
695 kilos coke
120 nautical miles north of Willemstad, Curacao,
35 (38-3)/I 168-210

| | |
|---|---|
| Geovanni Contreras-Suarez | PENDING |
| Joselo Ruiz-Batista | PENDING |
| Yeifry Brito-Rijo[5] | 120 months |

<span style="color:red">120 mos. x $40,000/yr = $400,000</span>


1:21-223-KB
No connection to US
1300 kilos coke
Pacific Ocean 232 nautical miles east of Clipperton Island, FR.
35 (38-3)/I 168-210
Variances Granted Due to Mitigating Circumstances

| | |
|---|---|
| Willian Eusebio Pincay Anchundia, | 60 months (captain) |
| Jorge Luis Lopez Pincay, | 48 months |
| Ivan Darwin Anchundia Pincay | 48 months |

<span style="color:red">156 mos. x $40.000/yr = $520,000</span>

19-CR-00033-JB
Headed to US
36/I
(at least 150 kilograms but less than 450 kilograms of coke)
After Trial

| | |
|---|---|
| PEDRO DINO CEDADO NUNEZ | 152 months |
| ANGEL CASTRO GARCIA | 188 months |
| MANELY ENRIQUEZ | 188 months |
| MIKE CASTRO MARTINEZ | 188 months |


Pursuant to 18 U.S.C. §3553(a), **we respectfully submit that** a sentence of five to seven years would be sufficient, but not greater than necessary to achieve the objectives of sentencing.

---

[5] Criminal History Category II but received Safety Valve departure pursuant to First Step Act and U*nited States v. Garcon*, 54 F.4th 1274, (11th Cir. Decided December 6, 2022

In determining an appropriate sentence pursuant to 18 U.S.C. §3553(a), Mr. Payan asks the Court to consider a downward variance below the mandatory statutory minimum. It is undisputed that he acted as courier, he has no history of criminal conduct or drug dealing. Up to this point, he worked as a fisherman or mariner to support his family.

The guidelines also support a downward departure. Under U.S.S.G. § 5K2.20, aberrant behavior, is an encouraged ground for downward departure where the nature of the offense reflects a crime committed without significant planning, by Mr. Payan, was of a limited duration, and represents a marked deviation from an otherwise law-abiding life. U.S.S.G. §5K2.20(b).

A low risk of recidivism is a statutory factor that must be considered. As recognized by the U.S. Sentencing Commission, "[r]ecidivism risk . . . is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points."[6]

U.S.S.G. §5K2.0 also encourages the Court to depart where there exist mitigating circumstances not adequately considered in the determination of the guideline range or that exist to a degree substantially in excess of the typical "heartland" case. U.S.S.G. §5K2.0(a)(2). We submit that the nature and circumstances of the offense and the personal history and characteristics of Mr. Payan are sufficiently unlike the typical heartland case to warrant a departure. The guideline range overstates his culpability. A mechanical use of the drug quantity table distorts the level of culpability, it does not reflect Mr. Wilmer O. Payan level of culpability in this offense.[7] U.S.S.G.

---

[6] A *Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score*, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (January 2005).

[7] *See* Paul J. Hofer & Mark H. Allenbaugh, "The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines," 40 Am. Crim. L. Rev. 19, 71-74 (2003): "[I]mportant moral questions of culpability are relatively neglected, while more easily quantifiable issues of harm are elevated to a significance and exactitude beyond their worth.

7

§5K2.0 allows the Court to use its discretion in determining which cases are sufficiently different to warrant a sentence different from that produced by the calculation of the guideline range.

It was never Wilmer O. Payan's intention to come to the United States or to violate its laws. He will be deported upon completion of his sentence and will be banned from the United States for life due to the nature of the offense as an aggravated felony. Still, Mr. Payan appreciates that what he did was wrong and is deeply remorseful for his conduct.

As evidenced by the continuing support of his family. The consequences for his family, and children are already devastating. Additional incarceration will work a hardship upon him, his family and the taxpayers who must pay for his incarceration. Finally, like all non-citizens, subject to deportation, Payan will not have the opportunity to avail himself of the opportunity to enroll in programs to earn credit to reduce his sentence under the *First Step Act*. Unlike most prisoners in the United States, he likely will not see his wife or his children while incarcerated because of their lack of funds, the distance, and cost of travel from Colombia. All the above circumstances can be considered under § 3553 supporting variance below the statutory minimum. Mr. Payan learned from this experience. His arrest, prosecution, and incarceration, the first of its kind in his life, is more than enough to convince him of the danger and futility of this venture.

    Respectfully submitted.

    s/CARLOS A. WILLIAMS WILL9821)
    11 North Water Street Suite # 11290
    Mobile, Alabama 36602
    251-433-0910
    251-433-0686 (FAX)

**CERTIFICATE OF SERVICE**

I certify that on February 20, 2023, a copy of the above and foregoing instrument was furnished to the Assistant U.S. Attorney assigned to this case, by e-mail, to AUSA George May.

s/CARLOS A. WILLIAMS